CANTERBURY PROPERTIES, INC., A NEW JERSEY COR-
PORATION, PLAINTIFF-RESPONDENT, v. THE MUNIC-
IPAL UTILITIES AUTHORITY OF MT. LAUREL TOWN-
SHIP, DEFENDANT-APPELLANT, AND MT. LAUREL
SEWERAGE CORPORATION, A NEW JERSEY CORPORA-
TION (NOW KNOWN AS SEWEL, INC.), MT. LAUREL
WATER CORPORATION, A NEW JERSEY CORPORATION
(NOW KNOWN AS WATERMOUNT, INC.), AND RICHARD
C. GOODWIN, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued June 4, 1973—Decided July 11, 1973.

450

Before Judges CARTON, MINTZ and SEIDMAN.

*Mr. John W. Trimble* argued the cause for Defendant-Appellant, Municipal Utilities Authority of Mt. Laurel Township (*Messrs. Higgins & Trimble,* attorneys).

*Mr. John A. Jones* argued the cause for Plaintiff-Respondent, Canterbury Properties, Inc. (*Messrs. Toll, Friedman, Pinsky and Jones,* attorneys).

*Mr. Josiah E. DuBois, Jr.* argued the cause for Defendants-Respondents, Mt. Laurel Sewerage Corporation, Mt. Laurel Water Corporation, and Richard C. Goodwin (*Messrs. DuBois, Maiale & DuBois,* attorneys).

The opinion of the court was delivered by

CARTON, P. J. A. D.   The result in this case turns on the validity of certain covenants made by defendant Municipal Utilities Authority of Mt. Laurel Township in connection with its acquisition of a sewerage and water supply system. An outline of the events leading up to the present litigation will serve to provide a backdrop for a more detailed consideration of the factual and legal issues involved.

Defendant Municipal Utilities Authority agreed to purchase the sewerage and water systems from defendant utility companies and in conjunction with that acquisition it assumed performance of certain covenants undertaken by the sellers in agreements between them and various land developers fixing the amount of fees to be charged for connecting dwelling houses in these developments to the systems. When defendant Authority adopted a rate schedule increasing the connection

fees and attempted to make them retroactive, plaintiff, the owner of one of the developments, objected, claiming the Authority was bound by the terms of the collateral agreements which it had assumed. It brought this action seeking a determination to that effect, recovery of fees paid under protest in accordance with the revised schedule, and restraint against collection of further fees except in accordance with the agreements between it and the sewerage and water companies. The court entered judgment in favor of plaintiff and defendant Authority appeals.

Plaintiff Canterbury Properties, Inc. is the assignee of two agreements between Alan and Harris Kessler, co-partners, and the Mt. Laurel Sewerage Corporation and the Mt. Laurel Water Corporation. The Kessler brothers are land developers who control a 77-acre tract in the Township of Mt. Laurel, a formerly rural municipality rapidly becoming part of suburban Philadelphia. The housing development of single-family residences constructed on that tract is known as Canterbury Greene.

The water and sewerage companies referred to above were privately-owned utilities organized and controlled by defendant Richard C. Goodwin, also a land developer in the township. Goodwin, as part of his business operations, constructs water and sewerage facilities for his housing developments and enters into service agreements with nearby developers. In all, there were 18 sewerage and 11 water contracts entered into in Mt. Laurel.

The agreements between the Kesslers and the sewerage company, which was entered into in April 1967, provided that the first 200 homes in the tract would be connected to the system without any connection charge as such. As to any further homes, a charge of $275 would be made for such connection. The agreement also required the Kesslers to pay the cost of constructing a pumping station and force main, which cost would be returned to the Kesslers over a 15-year period except for the sum of $53,000. This sum was

stipulated by the parties to represent a prepayment of connection fees.

In May 1968 the Kesslers assigned the agreement to plaintiff. They completed construction of the pumping station and force main at about the same time at a total cost of $135,000. Housing construction was then begun. By May 1971, 197 homes were completed and connected to the utility systems.

In the Spring of 1969 the Superior Court appointed commissioners to fix compensation for a public taking of the utilities by defendant Authority, a municipal agency formed under *N. J. S. A.* 40:14B–1 *et seq.* In July 1969 the commissioners reported a value of $1,182,953 for the sewerage corporation and in August of that year they reported a value of $763,893 for the water corporation. The condemnation action proved abortive because the Authority was unable to float a bond issue in that amount.

On April 9, 1970, however, the Authority and the utility companies reached an agreement of sale by which the Authority agreed to purchase all the facilities of the utility companies and assume all its existing contracts for $1,500,000 cash plus $300,000 in Authority bonds, if the Authority was able to issue bonds in the total amount. The bonds were apparently so issued and the sale completed on June 29, 1970. At that time the Kesslers were reimbursed by the utility companies for their construction expenditures in connection with the utility systems, minus $53,000.

On June 24, 1970 (five days prior to the sale, but a month after it negotiated the purchase agreement) the Authority adopted a rate schedule which provided for a connection charge of $100 for water service and $300 for sewerage. A new municipal government was elected in November 1970 and four new appointments were made to the Authority. By letter of January 11, 1971 the Authority informed plaintiff that it would enforce the rate schedule, including connection fees, retroactively to June 24, 1970, notwithstanding any prior agreements. It threatened to deny plaintiff's houses connection to the utility system and to inform the township

committee that certificates of occupancy should not be granted. The township building inspector subsequently did deny a certificate of occupancy and plaintiff was obliged to pay the fees.

Plaintiff paid the sum of $13,000 directly to defendant Authority, representing fees for 30 homes. Plaintiff then instituted this suit against the Authority, the utility companies, and Richard C. Goodwin, individually. Defendant Authority cross-claimed against Goodwin and the utility companies. On October 20, 1971 the trial judge ordered the establishment of an escrow account for future connection fees. The sum of $11,600 was paid into this account. As part of the stipulation of facts, plaintiff and the Authority agreed to a settlement of their claims against each other before extending the litigation to Goodwin and the utility companies.

The ultimate question thus is whether the Authority's revised schedule of connection fees is applicable to plaintiff and the houses constructed in its development. We think not.

Defendant Authority's argument for avoidance of any obligation to comply with the connection fee arrangement between its predecessor and the utility companies (from which it purchased the facilities) is two-fold. It argues first that the original agreements between the private utility companies and the developer were unenforceable because they violated Board of Public Utility Commissioners' regulations. Secondly, it contends that even if such agreements were valid as between the original parties, they were unenforceable against the Authority because their assumption was *ultra vires*. In particular, they urge that the agreements violate the mandate of the Municipal Utilities Authority Act, *N. J. S. A.* 40 :14B–1 *et seq.,* that connection fees be uniform within the district.

■ ■ The first argument is devoid of merit. The agreements accompanied requests by the utility companies for the Board to approve resolutions of the governing body granting municipal consents to service the lands covered by them.

They provided for the extension of sewerage and water service within areas already within the franchise of the utilities and were presumably filed under *N. J. S. A.* 48:2–27, entitled "Extension of facilities." The Board, in its decisions approving such municipal consents, specifically referred to the agreements which set forth the schedule of fees for making connections. We find nothing in the record which provides a basis for any contention that the Board exceeded its statutory grant of power. It seems apparent that its action in granting such approval was clearly within the scope of the statutory language which authorized such approval "where, in the judgment of the board, the extension is reasonable and practicable * * *."

The fact that the procedure followed by the Board may not have followed its own suggested formula for approval of such extensions did not take the Board's action beyond such grant of power. In any event, such a procedural irregularity before that Board is not subject to collateral attack by a party in this fashion.

We turn to defendant municipal authority's principal argument, that the agreements between the utility companies and the property owner with respect to connection fees are *ultra vires* and unenforceable because the Authority had no power to assume such agreements. At the outset it should be noted that defendant Authority does not seeek a rescission of the sale of the sewerage and water plants, but merely to set aside that part of the transaction in which it assumed performance of the agreement relating to connection fees.

The Authority's reliance upon *Spoerl v. Pennsauken Tp.*, 14 *N. J.* 186 (1954), is misplaced. We agree that *Spoerl* supports the general proposition that a municipal corporation need not be bound by an agreement not to charge sewerage fees if that agreement is *ultra vires*. However, it does not follow that all such agreements are *ultra vires*. *Spoerl* holds that only those without adequate consideration are unenforceable.

In *Spoerl* a municipality conveyed a parcel of real estate to the plaintiff's predecessor in title through a deed containing a covenant running with the land that it "shall not be subject to assessment for the cost of any municipal sewerage facilities which shall be erected or constructed * * *." The court said:

Our attention is not called to, nor does our research uncover, any statutory provision granting a municipality the authority and power to give a covenant relieving property of the burden ordinarily imposed by receipt of benefits, but arrangements giving up the city's right to collect assessments for benefits have been entered into under appropriate contracts and have been sustained under certain circumstances. In every instance, however, emphasis has been placed upon the necessity of determining whether there was adequate consideration for the right relinquished by the municipality. * * * [14 *N. J.* at 189-190]

The court concluded that where the grantee had conveyed at only $2 a front foot and the assessments totaled $7.10 a front foot, there was a "substantial deficiency in consideration." *Id.* at 194.

Defendant Authority's suggestion that there is likewise a deficiency of consideration here, that the Authority received nothing for its assumption of the agreements, is wide of the mark. The Authority bargained for and obtained the facilities of Mt. Laurel Sewerage Corporation and Mt. Laurel Water Corporation, as well as the benefits of any existing contracts. In exchange it paid $1,500,000 in cash, $300,000 in bonds, and assumed the burdens of any existing contracts.

There is nothing in the record to indicate, nor does the Authority charge, fraud on the part of the sellers. Nor do the circumstances suggest that it was an unconscionable agreement. The condemnation commissioners, who were apprised of the outstanding contracts, reported that the utility companies had a value of approximately $1,950,000. This amount was some $150,000 more than was actually paid as a result of the later, and apparently extended, negotiations between the utilities and the Authority.

The lower price negotiated by the municipal authority and the circumstance that all parties were aware of the existence of the contracts prompted the inquiry by the trial court whether that reduction did not reflect a credit to be given to reflect the connection fee provisions in the agreement. We agree with the trial court's conclusion that the credit was not an unlimited one in time or amount. The court correctly pointed out that the obligation to grant credits was limited by the number of homes that could be built on the land. The record shows that plaintiff had only a limited acreage to develop and that the property was already partially developed when the Authority acquired the sewerage and water facilities from the utilities. The pattern of development was therefore clearly discernible and a present value could readily be placd on the burden imposed by the agreements at the time of their assumption.

The Authority makes the subsidiary argument that even if the assumption of the agreement was not *ultra vires* for lack of consideration, it was *ultra vires* under *N. J. S. A.* 40 :14B–21 and 22. These sections of the Municipal Utilities Authorities Act empower the Authority to charge and collect fees "for direct or indirect connection with" the water or sewerage system. Such fees "shall as nearly as the municipal authority shall deem practicable and equitable be uniform throughout the district for the same type, class and amount of use [products] or service" of the water or sewerage system.

▮ Defendant thus argues that the statutory requirement of uniformity prohibits the Authority from assuming agreements which exempt certain property owners from connection fees.

In *Airwick Industries, Inc. v. Carlstadt Sewerage Auth.,* 57 *N. J.* 107 (1970), our Supreme Court analyzed the parallel section (identical language) of the Sewerage Authorities Law, *N. J. S. A.* 40 :14A–1 *et seq.,* and concluded that

* * * The statute need not be read to require precise mathematical equality, but rather to contemplate rough equality, keeping in mind that we are in an area in which, as with respect to other tax

impositions. absolute equality is neither feasible nor constitutionally vital. The Authority may, therefore, in its discretion, prescribe a schedule of connection fees escalating with the passage of time, requiring a potential user to absorb a fair proportion of the sum theretofore paid by the actual users for principal and interest on the bonds. [At 122]

In that case the Authority required higher fees of later connecting property owners though their property use may have been of the same type as earlier, lower-paying customers. The court's decision in that case suggests that a pragmatic test must be applied in the interpretation of the requirement for uniformity "as nearly as the municipal authority shall deem practicable and equitable * * *."

In *Airwick* the court found it inequitable to require the original customers to pay the lion's share of initial construction costs when the property value of prospective customers was likewise being enhanced by the utility system. Here it would be inequitable to impose a second connection fee on plaintiff's properties when its initial prepayment of such was, or ought to have been, reflected in the purchase price of the system.

The Authority, and thereby its customers, obtained the facilities at a lower price than it otherwise would have because plaintiff had already paid connection fees. The amount the price was lowered should have been equal to the anticipated loss of connection fees due to the assumed agreement.

Essentially, *Airwick* requires that any discrimination in fees between similar property users be justifiable. That holding was recently reaffirmed in *S. S. & O. Corp. v. Tp. of Bernards Sewerage Auth.*, 62 *N. J.* 369 (1973). Such is the case here.

In this connection it should be noted that section 23 of the act permits authorities to revise their schedule of fees periodically so that they may be adequate to cover the operational costs of the system. (The parallel section of the Sewerage Authorities Law says they *shall* be adequate.) We also note that section 24 of the act permits the municipality

serviced by the Authority to loan or donate funds to the Authority which presumably may be used to make up any deficits.

In our estimation, the element of practicability, as well as equitability, was present in the Authority's assumption of the agreements.

The Municipal Utilities Authorities Act contemplates that such authorities may acquire as well as construct their own facilities. *N. J. S. A.* 40:14B–2. Assumption of these agreements may very well have been a necessary precondition to acquisition (or as said previously, at least resulted in a lower, possible to finance, purchase price).

The Municipal Utilities Authorities Act read as a whole gives authorities created under its provisions a definite flexibility in their operations. (They are not, for example, at the present time subject to the Local Bond Law or the Local Public Contracts Law.) The policy expressed in the statute is "to foster and promote *by all reasonable means* the provision and distribution of an adequate supply of water * * * and the relief of waters * * * from pollution * * *." (Emphasis added). The stated purpose of the act is to implement this policy by granting to such authorities "discretionary powers" to provide such services. *N. J. S. A.* 40:14B–2. The statute specifically confers upon such authorities the power "[t]o enter into any and all contracts * * * convenient or desirable for the purposes of the municipal authority or to carry out any power expressly given in this act." *N. J. S. A.* 40:14B–20(12). In apparent harmony with this broad grant of authority is the language of section 23 referred to above, stating that any revision of fees "shall comply with the terms of *any* contract of the municipal authority * * *." (Emphasis added).

▉ It would thus appear that, absent any gross inequities, the Legislature contemplated that authorities should be bound by the contract it had the power to make. Since none appears here, the judgment appealed from is affirmed.